<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

—————————————————————
:
INDAGRO, S.A.,                                                        :                    Civil Action No. 07-3742 (MCA)
:
*Plaintiff*,                                          :
:
v.                                             :
:                         OPINION
VENIAMIN NILVA and VIVA                      :
CHEMICAL CORPORATION,                        :
:
*Defendants*.                                  :
—————————————————————:

ARLEO, UNITED STATES DISTRICT JUDGE

This matter comes before the Court upon Defendant Veniamin Nilva's ("Defendant" or
"Nilva") motion for summary judgment.  Dkt. No. 132.  Plaintiff Indagro, S.A. ("Plaintiff" or
"Indagro") opposes the motion.  Dkt. No. 140.  Upon the Court's request, the parties submitted
supplemental briefing.  Dkt. Nos. 148, 149.  This motion was decided on the papers pursuant to
Federal Rule of Civil Procedure 78.  For the reasons set forth below, Defendant's motion is
**GRANTED.**

I.        BACKGROUND

This matter arises from a contractual dispute between Indagro and Defendant Viva
Chemical Corporation ("Viva") and a subsequent arbitration before the International Chamber of
Commerce ("ICC").

In 1995, Viva was incorporated in New Jersey and maintained a home office in Fort Lee,
New Jersey, and a satellite office in Moscow, Russia.  Defendant's Rule 56.1 Statement of
Undisputed Material Facts ("Def. Statement") ¶¶ 1-2, Dkt. No. 137-8.  From its inception
through 1998, Viva was owned 75% by Nilva and 25% by Constantine Lutsenko ("Lutsenko"),

Viva's Vice President.  Id. ¶ 3.  Beginning in 1999, Nilva and Lutsenko became equal partners in Viva, and their respective ownership interests in Viva remained at 50% each through the relevant time period of Viva's dispute with Indagro.  Id. ¶ 4.

Viva was engaged in the business of the purchase, resale, and transportation of commodities internationally.  Id. ¶ 5.  Viva purchased hundreds of thousands of metric tons per year of chemical products such as urea, ammonium nitrate, ammonium sulfate, methanol, and sulfur, among others, from a number of major chemical manufacturers based in Russia and in former Soviet republics and resold its product to numerous international buyers.  Id. ¶ 8.

On or about August 25, 2004, Indagro and Viva entered into a Joint Venture Agreement ("JVA") for the purpose of purchasing and reselling sulfur in bulk. Def. Statement ¶ 11; Compl. Ex. 1, Dkt. No. 1-1.  In April 2005, a dispute arose between the parties whereby Indagro claimed that Viva wrongfully appropriated for its own account sulfur that was supposed to be sold by Indagro pursuant to the terms of the JVA.  Def. Statement ¶ 14.  The JVA contained a broad arbitration provision which provided that: "[a]ny dispute that cannot be settled amicably to be referred for arbitration at ICC Paris in English language."  JVA, Compl. Ex. 1 at 3, Dkt. No. 1-1. Efforts to amicably settle the dispute failed, and Indagro commenced arbitration against Viva on October 18, 2005 at the ICC in accordance with the terms of the JVA.  Def. Statement ¶ 15.  The only named parties to the arbitration were Indagro and Viva.  Def. Statement ¶ 17.

The evidentiary hearing for the arbitration was scheduled to take place in London, England on July 11, 2006.  Id. ¶ 20.  On behalf of Viva, the hearing was attended by Lutsenko, Viva's Vice President, and Andrew Meads ("Meads"), Viva's counsel.  Id.  Nilva, who was in the United States at the time, did not attend the hearing.  Id.  Indagro was represented at the hearing by its attorney, Andrew de Klerk ("de Klerk"), who was accompanied by Theo Del

Conte ("Del Conte"), Indagro's Managing Director, Joseph Efthimiades ("Efthimiades"), a trader at Indagro, and Esti Martinez ("Martinez"), Indagro's in-house counsel. Id.

During the first day of the hearing, Viva proposed a settlement whereby the hearing would be adjourned to allow the parties to each conduct an accounting procedure of the JVA's finances as opposed to a protracted arbitration hearing. Id.; Plaintiff's Rule 56.1 Response Statement ("Pl. Statement") ¶ 20. Indagro indicated that its agreement to this proposal—to conduct an accounting procedure—was conditioned on each party securing reciprocal personal guarantees from their respective principals, including Nilva and Lutsenko on behalf of Viva, to cover any obligation on the part of the respective corporations. Def. Statement ¶ 22; Pl. Statement ¶ 22. Lutsenko left the conference room and telephoned Nilva to discuss the proposal and Indagro's insistence on reciprocal guarantees. Def. Statement ¶ 23. Meads remained in the room with the other attendees and did not participate in or overhear Lutsenko's telephone conversation with Nilva. Id. Lutsenko returned to the conference room and informed those in attendance that Nilva had agreed to provide a personal guarantee on behalf of Viva, that he would also provide a personal guarantee, and that Viva agreed to resolve the dispute based on the accounting procedure. Def. Statement ¶ 25. The arbitrator entered "Procedural Order No. 4 into the record that day and signed it. Id. ¶ 26. The Order provided that the parties "decided to continue this arbitration as set out in the 'Text of Procedural Order by Consent,' appended to this Procedural Order No. 4." See Meads Decl. Ex. A, Dkt. No. 137-2.

The "Text of Procedural Order by Consent" ("Procedural Order") provided, inter alia, that "this arbitration will be decided on documents only, save as to procedural hearings which will ordinarily be by telephone and subject to the liberty of either party to apply to show cause why there should be a reversion to an oral procedure." Id. The agreement also provided a date

3

for the parties to exchange documents by, as well as a procedure and sanction to follow if one side failed to comply.  Id.  It provided that the parties would serve written submissions on one another indicating what amounts, if any, were owed, followed by a procedural hearing by telephone with the arbitrator, and the issuance of an award on the merits.  Id.  The Procedural Order was signed by de Klerk, for and on behalf of Claimant, Indagro, and by Meads, for and on behalf of Respondent, Viva.  Id.  There was no mention of any reciprocal personal guarantee in the Procedural Order.  See id.

The following morning, on July 12, 2006, Meads, Viva's counsel, emailed de Klerk, Indagro's counsel, to explain that contrary to what Lutsenko reported, Nilva had not agreed to give a personal guarantee on behalf of Viva.  Def. Statement ¶ 29; Meads Decl. Ex B, Dkt. No 137-3.  Meads relayed an alternative offer by Viva for Nilva and Lutsenko to give alternative security to Indagro.  Def. Statement ¶ 29.  On July 13, 2006, Meads notified the ICC arbitrator about this development.  Def. Statement ¶ 30; Meads Decl. Ex. C, Dkt. No. 137-4.

On July 14, 2006, de Klerk emailed the arbitrator and explained that: "Nilva refused to abide by the agreement reached between the parties" and that Viva has "reneged."  Meads Decl. Ex. D, Dkt. No. 137-5; see also Def. Statement ¶ 33.  De Klerk explained that "there is no doubt that the provision of the personal guarantee by both parties . . . was the fundamental basis of the agreement to change the process to one of accounting, and to enter the Consent Procedural Order."  Meads Decl. Ex. D.  He explained that "[i]f the Respondents do not fulfill their part of the agreement as promised within one week of today, Claimants will make application to set aside the Procedural Order and reset the evidentiary hearing."  Id.  Indagro noted that "[t]he application will include a prayer for a cost award to cover the wasted expense of the hearing just

held" and that "either we proceed as agreed or the parties are put back in the position they were before the Respondents breached the agreement that was made on July 11."  Id.

During a subsequent conference call with the arbitrator addressing Indagro's request, the arbitrator noted that without the personal guarantees, the agreement to conduct an accounting procedure would fall.  Def. Statement ¶ 34.  The arbitrator, however, suggested that the parties continue with the accounting procedure, with Indagro reserving its right to renew its application to revert to an oral evidentiary hearing once that was complete.  Id. ¶ 35; see also Grand Decl. Exs. A and B, Dkt. Nos. 149-2, 149-3.  The parties proceeded on this basis.  Id.  Following an exchange of statements of account, Indagro renewed its application to revert to an oral hearing pursuant to its right in the Procedural Order.  See Def. Statement ¶ 36; Meads Decl. Ex. E, Dkt. No. 137-6.

On October 31, 2006, the arbitrator granted Indagro's request to revert to an oral procedure.  See Def. Statement ¶ 37; Meads Decl. Ex. F ¶ 4.22, Dkt. No. 137-7.  A full evidentiary oral hearing on the merits took place in December 2006.  Def. Statement ¶ 37; Compl. ¶ 16.  On May 1, 2007, the ICC ruled in favor of Indagro, awarding it $678,909.91 in damages, plus interest, legal fees, and costs.  Def. Statement, ¶ 38; Meads Decl. Ex. F, Dkt. No. 137-7.  The arbitrator determined that he could not consider Viva's counterclaims as offset based on the ICC rules, but that Viva could pursue those claims in a separate arbitration.  Id.[1]

On August 8, 2007, Indagro filed the instant action in this Court asserting four causes of action: (1) to confirm the arbitration award against Viva; (2) for  breach of contract against Nilva

---

[1] Subsequently, in September 2007, Viva filed a second arbitration against Indagro.  Def. Statement ¶ 39.  Nilva claims the second arbitration resulted in an award of damages in Viva's favor in the amount of $506,810.44.  Def. Statement ¶ 39.  Indagro, however, contends that Viva never moved to confirm the second arbitration award in this action or any other, and that it is therefore time-barred.  Pl. Statement ¶ 39.  This is not a genuine issue of material fact relevant to the instant motion.

based on his authorized representatives agreement "to post a personal guarantee to pay the amount of any award set by the Arbitrator…" ; (3) "piercing the corporate veil" of Viva to collect the judgment against Viva from Nilva; and (4) specific performance to order Nilva to provide a personal guarantee to pay the award issued by the arbitrator.  Compl. ¶¶ 20-39.

On November 19, 2008, the District Court confirmed the ICC Arbitration Award dated May 1, 2007 against Viva (Count One), and awarded Indagro the full amount requested of $678,900.91 as damages, plus interest, legal expenses in the amount of $191,610.00, £4,791.84, and £5,440, and arbitration expenses in the amount of $55,000 pursuant to the Arbitration Award.  See Dkt. No. 26.  The Court stayed the Order pending the conclusion of the second arbitration proceeding initiated by Viva.  Id.  On August 29, 2011, the Court lifted the stay and reconfirmed the arbitration award in favor of Indagro.  See Dkt. No. 60.

This Motion followed.  Dkt. No. 132.

## II.      LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law."  Id. at 248.  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  The dispute is not genuine if it merely involves "some metaphysical

doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

Further, the nonmoving party cannot rest upon mere allegations; he must present actual evidence that creates a genuine issue of material fact.  <u>See</u> FED. R. CIV. P. 56(e); <u>Anderson</u>, 477 U.S. at 249 (citing <u>First Nat'l Bank v. Cities Serv. Co.</u>, 391 U.S. 253, 290 (1968)).  In conducting a review of the facts, the non-moving party is entitled to all reasonable inferences and the record is construed in the light most favorable to that party.  <u>Hip Heightened Indep. & Progress, Inc. v. Port Auth. of New York & New Jersey</u>, 693 F.3d 345, 351 (3d Cir. 2012).  Accordingly, it is not the Court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party.  <u>See</u> <u>Brooks v. Kyler</u>, 204 F.3d 102, 105 n.5 (3d Cir. 2000) (citing <u>Anderson</u>, 477 U.S. at 249); <u>Big Apple BMW v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.    ANALYSIS[2]

### a.  Counts Two and Four—Breach of Contract and Specific Performance

In Count Two, Indagro alleges a breach of contract against Nilva – that agreement made on Nilva's behalf by his "authorized representatives," Lutsenko and Meads, to personally guarantee the arbitrator's award "as being owed as a result of the JVA accounting."  Compl. ¶

---

[2] Indagro claims summary judgment is improper at this stage pursuant to Federal Rule of Civil Procedure 56(d).  Rule 56(d) provides that: "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.  FED. R. CIV. P. 56(d).  Indagro contends that during Meads deposition, it avoided any discussions about the substance of privileged communications between Nilva and Meads, and now, on summary judgment, Meads and Nilva filed declarations discussing the substance of those conversations, constituting waiver of privilege.  Indagro seeks to reopen discovery to take "full factual discovery relating to its personal claims against Nilva."  Indagro has failed, however, to identify any questions that Nilva or Meads refused to answer by invoking privilege, and failed to explain what information it seeks to expand upon.  Indagro's request is therefore denied.

26.   Indagro claims that as a result of Nilva's breach, Indagro was forced to proceed with a plenary arbitration to conclusion, and obtain an award, which has not been paid.  Id. ¶ 27.  In Count Four, Indagro asks the Court to order Nilva to provide the personal guarantee that he allegedly agreed to through his authorized representatives.  Id. ¶¶ 35-39.  Such promise to guarantee the debt of another is barred by the statute of frauds.

### i.  Statute of Frauds

New Jersey follows the rule that an agreement to assume the debt of another must be in writing.  Atl. City Assocs. LLC v. Carter & Burgess Consultants, Inc., No. 05-3227, 2007 U.S. Dist. LEXIS 68118, at *16 (D.N.J. Sep. 14, 2007) (citing Heywood-Wakefield Co v. Miner, 44 F.2d 152, 154 (3d Cir. 1930)); Norben Imp. Corp. v. Metro. Plant & Flower Corp., No. 05-54, 2005 WL 1677479, at *11 (D.N.J. July 15, 2005)).[3]  Without a written assignment of debt, a claim for breach of the agreement is barred by the statute of frauds.  Atl. City Assocs., 2007 U.S. Dist. LEXIS 68118, at *16 (internal citations omitted); see also Magna Fabrics, Inc. v. N.Y. Art & Shipping, LLC, No. A-5322-11T3, 2013 N.J. Super. Unpub. LEXIS 2016, at *9 (Super. Ct.

---

[3] Curiously, for the first time in his supplemental briefing, Nilva argues that English law, as opposed to New Jersey law, governs Indagro's second and fourth causes of action.  Dkt. No. 149. In support, Nilva relies on an email exchange between the parties in the underlying arbitration, agreeing to apply English law in that dispute.  See Meads Decl. Ex. F § 2.4, Dkt. No 137-7. There is a question as to whether this informal agreement is even a choice of law provision that is contractually enforceable.  Moreover, the choice of law analysis is only relevant if there is an actual conflict between New Jersey law and English law.  See P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 143-144 (2008) (explaining that New Jersey uses a two-step inquiry for choice of law analysis: first, determine whether an actual conflict exists; if one does, then determine who has the "most significant relationship" to the claim).  Nowhere in the hundreds of pages of briefing does either party identify how English law conflicts with New Jersey law relating to Indagro's claims.  At least insofar as the requirements to enforce a personal guarantee are concerned, it appears from Nilva's moving brief that there is no such conflict.  See Def. Moving Br. at 18 n.3, Dkt. No 132-1.  Both New Jersey and English law require a signed writing for a personal guarantee to be enforced.  Thus, the choice of law issue is irrelevant and New Jersey law applies.

App. Div. Aug. 8, 2013) ("The statute of frauds bars the enforcement of oral agreements to guarantee the debts of another.").  New Jersey's statute of frauds states:

> A promise to be liable for the obligation of another person, in order to be enforceable, shall be in a writing signed by the person assuming the liability or by that person's agent. The consideration for the promise need not be stated in the writing.

N.J. Stat. Ann. § 25:1-15.  The language in the above statute makes clear that the writing must be signed by the person assuming the debt, or by that person's agent.  Atl. City Assocs., 2007 U.S. Dist. LEXIS 68118, at *19.

Thus, a corporation's debt cannot be imposed on an officer/director/shareholder absent a written guarantee signed by the officer/director/shareholder or her agent.  As one court explained:

> A corporate entity's outstanding account or debt may not be imposed as a liability on an officer, director, or shareholder of the corporate entity unless there is a separate and distinct guaranty, which is executed by the officer, director, or shareholder independently of any other clauses or provisions of the agreement. That is, a separate and distinct provision, with a separate and distinct signature, must exist to bind the individual officer, director, or shareholder.

Century Star Fuel Corp. v. Jaffe, No. BER-L-6045-13, 2014 N.J. Super. Unpub. LEXIS 2764, at *9 (N.J. Super. Ct. Ch. Div. Nov. 21, 2014).

In order to avoid the clear application of the statute of frauds, Indagro tries to cast Counts Two and Four as a "breach [of] the partial settlement agreement, which required [Nilva] to enter into the personal guarantee in the first instance."  Pl. Supp. Br. at 9-10, Dkt. No. 148.[4]  Try as it

---

[4] Plaintiff claims that Nilva's agents—Lutsenko and Meads—waived the signed writing requirement of the statute of frauds.  Plaintiff has not provided, and the Court is not aware of, any law to support this proposition.  Indeed, were Plaintiff's theory true, a party could circumvent the signed writing requirement simply by alleging the other party waived it.  This is not the law.

may, this is a distinction without a difference.  Count Two is a breach of an oral agreement entered into by Nilva's alleged agents, Lutsenko and/or Meads,[5] to guarantee the debt of Viva. Count Four seeks to specifically enforce that agreement.  The only "writing" before the Court— the Procedural Order entered in the arbitration—makes no reference to the alleged personal guarantee agreement.  It is undisputed that the personal guarantee was never reduced to a signed writing.[6]  Construing the evidence before the Court in the light most favorable to the Plaintiff, and drawing every reasonable inference in favor of the Plaintiff, the Court finds that the alleged personal guarantee is unenforceable as barred by the statute of frauds.  Accordingly, Indagro's breach of contract and specific performance claims fail as a matter of law.

### ii.  Additional Grounds for Dismissal

Even if Plaintiff's claims for breach of contract and specific performance were not barred by the statute of frauds (they are), both claims fail based on waiver and lack of authority.

### 1.  Waiver by Indagro

"Waiver, under New Jersey law, involves the intentional relinquishment of a known right, and thus it must be shown that the party charged with the waiver knew of his or her legal rights and deliberately intended to relinquish them."  Shebar v. Sanyo Bus. Corp., 111 N.J. 276, 291 (1988); West Jersey Title & Guaranty Co. v. Industrial Trust Co., 27 N.J. 144, 152 (1958) (explaining that waiver "implies an election by the party to dispense with something of value, or to forego some advantage which that party might have demanded and insisted on").  "[T]he intention to waive need not be stated expressly but may be spelled out from a state of facts

---

[5] As discussed infra, neither Meads nor Lutsenko had authority to enter into the agreement on Nilva's behalf.

[6] Plaintiff acknowledges that the Procedural Order did not contain the personal guarantee agreement, and despite discussions between the parties' lawyers, the agreement was never memorialized in writing.  See de Klerk Decl. Ex. 6, Dkt. No. 140-1.

exhibiting full knowledge of the circumstances producing a right and continuing indifference to exercise of that right." Merchants Indem. Corp. v. Eggleston, 68 N.J. Super. 235, 254 (N.J. Super. Ct. App. Div. 1961), aff'd, 37 N.J. 114 (1962).

Here, Indagro's actions in the underlying arbitration constitute waiver of the claims against Nilva. The day after Lutsenko announced Nilva's purported guarantee, Nilva repudiated it. Attorney Meads so advised both de Klerk and the arbitrator of this development. And while the parties voluntarily agreed to proceed with the abbreviated "documents only" procedure initially, at Indagro's request, they ultimately reverted to the full arbitration hearing. The arbitration hearing concluded, Indagro received an award in its favor against Viva, and that award, at Indagro's request, was confirmed by the District Court.

This is a classic case of waiver. Indagro made a tactical decision to move forward with the full arbitration hearing that it originally started and as contemplated by the JVA. In doing so, it intentionally relinquished any rights to have the arbitrator make his ruling based on the "documents only" procedure and thereby bind Nilva to a personal guarantee. Indagro cannot have it both ways. Now that the arbitration award against Viva has been confirmed, the parties cannot revert to the documents-only procedure. The genie cannot be put back in the bottle. Indagro's claims against Nilva for the personal guarantee—based on the arbitrator's findings after an abbreviated accounting procedure—are therefore waived.

### iii.   **Lack of Authority by Lutsenko and Meads**

Plaintiff's breach of contract and specific performance claims (Counts Two and Four) rest exclusively on the claim that Lutsenko (and somehow attorney Meads) were Nilva's agents who had authority to enter into the personal guarantee agreement on Nilva's behalf. An "agency relationship is created when one person (a principal) manifests assent to another person (an

agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." N.J. Lawyers' Fund for Client Prot. v. Stewart Title Guar. Co., 1 A.3d 632, 639 (N.J. 2010) (quoting Restatement (Third) of Agency § 1.01 (2006)). An agent must have authority—"actual" or "apparent"—to act for the principal. Sears Mortgage Corp. v. Rose, 134 N.J. 326, 338 (1993)). Based on the admissible evidence before the Court, neither Lutsenko nor Meads had authority—either actual or apparent—to bind Nilva.

## 1.   Actual Authority

"When an agent acts with actual authority, the agent reasonably believes, in accordance with manifestations of the principal, that the principal wishes the agent so to act." Licette Music Corp. v. Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, P.A., No. A-6595-06T2, 2009 N.J. Super. Unpub. LEXIS 1861, at *24 (Super. Ct. App. Div. July 16, 2009) (quoting Restatement (Third) of Agency § 7.04 cmt. B). The actual authority a principal gives to its agent may be express or implied. Automated Salvage Transport, Inc. v. N.J. Koninklijke KNP BT, 106 F. Supp. 2d 606, 617 (D.N.J. 1999). "Express authority is manifested through the principal's words or other conduct." Id. (citing Restatement (Second) of Agency § 26). "In such instances, a principal "specifies minutely what the agent is to do." Id. (quoting Restatement (Second) of Agency § 7 cmt. c). "Implied authority is 'incidental to a grant of express authority.'" Sylvan Learning Sys. v. Irwin Gordon, Fed. Ins. Co., 135 F. Supp. 2d 529, 542 (D.N.J. 2000) (quoting Thomas v. INS, 35 F.3d 1332, 1338 (9th Cir. 2000)). "For the most part, an agent has implied authority to undertake all transactions necessary to fulfill the duties required of an agent in exercise of express authority." Automated Salvage Transport, 106 F. Supp. 2d at 617. Such

authority is gleaned "from the words used, from customs and from the relations of the parties." Id. (quoting Restatement (Second) of Agency § 7 cmt. C).

Indagro claims Lutsenko and Meads had actual authority to bind Nilva for several reasons. First, Indagro claims that when Nilva told Lutsenko to respond to Indagro's proposal for a personal guarantee (regardless of whether Nilva accepted or rejected it), he made Lutsenko his agent. See Nilva Decl. ¶ 13, Dkt. No. 133-1. Next, Indagro claims that Lutsenko and Meads both "reasonably believed" from Nilva's words and actions that they had authority to bind Nilva to post a personal guarantee. See de Klerk Decl. Ex. 3, Dep. of Meads at 26-27, 30-32; Meads Decl. ¶ 2, Dkt. No. 87-2; Meads Decl. ¶ 14, Dkt. No. 137-1. Indagro also claims that Meads' email to de Klerk making an alternative offer of security from Nilva shows that Meads was acting as Nilva's agent. See de klerk Decl. Ex. 7, Dkt. No. 140-1. Indagro claims that, at the very least, there is a factual dispute about what Nilva told Lutsenko, which the jury should resolve after assessing Nilva's credibility. The Court disagrees.

Indagro has failed to allege any facts to suggest that Lutsenko or Meads had "actual authority" to act on behalf of Nilva. Upon review of the record, there does not appear to have been any manifestations by Nilva, through words or conduct, granting authority to Lutsenko or Meads to act as his agent.[7] Certainly, Nilva relaying his refusal to provide a personal guarantee to Lutsenko does not demonstrate such authority. Neither does Meads' subsequent emails to de

---

[7] Nilva unequivocally denies providing Lutsenko or Meads with authority. See, e.g., Nilva Decl. ¶ 13, Dkt. No. 133-1 ("I told Mr. Lutsenko that I would not agree to provide a personal guarantee on behalf of Viva."); id. ¶ 21 ("I did not agree at any time to provide a personal guarantee on behalf of Viva and did not authorize Mr. Lutsenko to inform the others in attendance at the hearing that I would do so."); id. ¶ 22 (I was "not a party to the arbitration and never authorized anyone to act on my individual behalf, including Mr. Lutsenko or Mr. Meads."); see also id. ¶ 9 ("I never engaged Andrew Meads to represent me in my personal capacity and at no time did Mr. Meads have the authority to act on my personal behalf.").

Klerk regarding the alternative security offer.[8]   Indagro is therefore left with portions of testimony and declarations from Meads, de Klerk, and Del Conte to establish that an agency relationship existed between Nilva and Lutsenko/Meads.  See, e.g., Meads Decl. ¶ 14, Dkt. No. 137-1; de Klerk Decl. ¶ 9, Dkt. No. 140-1; de Klerk Decl. Ex. 2, Dep. of Del Conte at 30-3.  This evidence, which details what Lutsenko allegedly told them Nilva said and what Lutsenko reasonably believed about his authority, is inadmissible hearsay evidence.

It is well settled that, in opposing a motion for summary judgment, "[a] plaintiff . . . must point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."   Clark v. Modern Grp. Ltd., 9 F.3d 321, 326 (3d Cir. 1993) (citation omitted).  Consistent with this well settled principle of law, the Third Circuit noted that "hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial."  Stelwagon Mfg. Co. v. Tarmac Roofing Sys., 63 F.3d 1267, 1275 n.17 (3d Cir. 1995) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993)).  There is no such evidence here.[9]  Thus, neither Lutsenko nor Meads had actual authority to act on Nilva's behalf.[10]

---

[8] Even if Nilva subsequently granted Meads authority to relay his alternative security offer to de Klerk (there is no evidence of this), it does not mean that Meads had authority during the arbitration to personally bind Nilva to give a personal guarantee.  In fact, Meads expressly declared that he only represented Viva during the arbitration, and that Nilva never engaged him to represent him.  See, e.g., Meads Decl. ¶ 1 (declaring that he represented Viva in the arbitration brought by Indagro, as Claimant, against Viva, as Respondent, before the ICC); id. ¶ 4 ("Mr. Nilva never engaged me to represent me in his personal capacity and I never acted, nor was I ever authorized to act, as attorney for Mr. Nilva personally.  At all times relevant to this dispute, my only client was Viva."); see also de Klerk Decl. Ex. 3, Dep. of Meads at 26-27; id. at 30-32.

[9] Federal Rule of Civil Procedure 56(e) provides that affidavits opposing summary judgment motions must "be made on personal knowledge"; and hearsay within such affidavits or testimony may be considered, but only where the hearsay declarant can be produced at trial to offer his or her statements in admissible form.  See Rossi v. Standard Roofing, Inc., 156 F.3d 452, 470 (3d Cir. 1998); Petruzzi's IGA, 998 F.2d at 1234-35; Philbin v. Trans Union Corp., 101 F.3d 957, 960-61 (3d Cir. 1996).  Neither Meads, nor de Klerk, or Del Conte had personal knowledge of

14

## 2. Apparent Authority

Indagro contends that even if Meads and Lutsenko did not have actual authority to bind Nilva, they had apparent authority to do so. Indagro claims that Nilva affirmatively sent Meads and Lutsenko to the arbitration on his behalf, that Indagro relied on Meads and Lutsenko's apparent authority to act for Nilva, and that Indagro's reliance was reasonable.

Where a purported agent lacks actual authority to act on another's behalf, it may still bind a principal "by virtue of apparent authority based on manifestations of that authority by the principal." Sears Mortg. Corp. v. Rose, 634 A.2d 74, 79 (N.J. 1993). In New Jersey, to prevail on a claim of apparent authority, a plaintiff must establish the following elements:

> (1) that the principal has manifested his consent to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority; (2) that the third person knew of the facts and, acting in good faith, had reason to believe, and did actually believe, that the agent possessed such authority; and (3) that the third person, relying on such appearance of authority, has changed his position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal.

Licette Music Corp., 2009 N.J. Super. Unpub. LEXIS 1861, at *25-26 (App. Div. July 16, 2009) (internal citation omitted). "Apparent authority by which a principal is bound is only that which 'a person of ordinary prudence' is justified in presuming from the conduct of the principal. Such authority is not expanded by the carelessness and indifference of the third party nor erected upon the misrepresentations of the agent." Wilzig v. Sisselman, 209 N.J. Super. 25, 35, 506 A.2d

---

what Nilva told Lutsenko on the phone, and the information about what Lutsenko told them Nilva said is hearsay. See FED. R. EVID. 602; FED. R. EVID. 801(c). To be admissible, such evidence must fall within an exception to the rule against hearsay, see FED. R. EVID. 802, and Plaintiff has not pointed to any hearsay exceptions here. In addition, there is no indication that Lutsenko can be produced at trial to offer his statements in admissible form. This statements are inadmissible.

[10] Because there is no evidence of any express authority here, no authority may be implied. See Automated Salvage Transport, 106 F. Supp. 2d at 617.

1238 (App. Div. 1986) (quoting <u>Mesce v. Automobile Ass'n of New Jersey</u>, 8 N.J. Super. 130, 136 (App. Div. 1950).  In applying the doctrine of apparent authority, the Court must look to any representations by the principal, and whether there was justified reliance on those representations by the third party.  <u>See Farmers & Merchs. Nat'l Bank v. San Clemente Fin. Grp. Sec.</u>, 174 F.R.D. 572, 579 (D.N.J. 1997).  The focus is on the <u>principal's acts and statements</u>; the agent's unilateral, unauthorized representations do not create apparent authority.  <u>See Wilzig</u>, 209 N.J. Super. at 36 (emphasis added).

Indagro has failed to produce evidence that demonstrates Lutsenko or Meads had apparent authority to bind Nilva.  It fails to meet both the first and third element.

The first element is that, "the principal has manifested his consent to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority . . . ."  As discussed <u>supra</u>, there is no evidence that Nilva "manifested his consent" or "knowingly permitted" Lutsenko or Meads to represent him personally in the arbitration.[11]  Indagro cannot meet the first element.

Indagro also fails to establish the third element which requires that, "the third person, relying on such appearance of authority, has changed his position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal."  There is no evidence here that Indagro suffered any injury as a result of its reliance on Lutsenko and Meads' representations regarding the personal guarantee.  Indagro learned the next day that Nilva would not provide a personal guarantee and that Meads and Lutsenko apparently lacked authority to act on his behalf.  Thereafter, Indagro elected to restore the matter to a full evidentiary hearing,

---

[11] As discussed <u>supra</u>, Indagro's reliance on third-parties' deposition testimony and declarations of what Lutsenko allegedly represented to the parties during the arbitration is inadmissible hearsay.

received an award in its favor, and successfully moved, in this Court, to confirm that award. Indagro, therefore, cannot show it would be injured without the personal guarantee. Because neither Lutsenko nor Meads had authority—either actual or apparent—to bind Nilva, the claims for breach of contract and specific performance fail as a matter of law.

### b. Count Three—Piercing the Corporate Veil

In Count Three, Indagro seeks to pierce Viva's corporate veil to reach Nilva personally. Compl. ¶¶ 29-34. Nilva contends there is insufficient evidence to support this claim. The Court agrees.

Generally, a corporation is considered an entity separate from its shareholders. Port Drivers Fed'n 18, Inc. v. All Saints Express., Inc., 757 F. Supp. 2d 443, 456 (D.N.J. 2010) (citing Richard A. Pulaski Const. Co., Inc. v. Air Frame Hangars, Inc., 950 A.2d 868, 877 (N.J. 2008)). Under New Jersey law, in order for a court to "pierce the corporate veil" and hold a shareholder personally liable "there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist," and "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." State Capital Title & Abstract Co. v. Pappas Bus. Servs., 646 F. Supp. 2d 668, 679 (D.N.J. 2009) (internal quotation marks omitted). In other words, the corporation must be the "alter ego" of the shareholder, such that the corporate form is effectively a legal fiction, and enforcing that legal fiction must result in some fundamental unfairness. Verni ex rel. Burstein v. Harry M. Stevens, Inc., 903 A.2d 475, 497-99 (N.J. Super. Ct. App. Div. 2006). The party seeking to pierce the veil bears the burden of proving that those circumstances are present, Richard A. Pulaski Constr. Co. v. Air Frame Hangars, Inc., 950 A.2d 868, 877-78 (2008), a burden that "is notoriously difficult for plaintiffs to meet," Pearson v. Component Tech. Corp., 247 F.3d 471, 485 (3d Cir. 2001);

Portfolio Fin. Serv. Co. v. Sharemax.com Inc., 334 F. Supp. 2d 620, 626 (D.N.J. 2004) (noting that the extraordinary circumstances that merit a finding that the corporate veil has been pierced do not extend to a plaintiff's difficulty in enforcing a judgment).

In determining whether to pierce the corporate veil, courts consider a variety of factors: (1) gross undercapitalization; (2) failure to observe corporate formalities; (3) non-payment of dividends; (4) the insolvency of the debtor corporation at the time; (5) non-functioning of other officers or directors; (6) absence of corporate records; and (7) the fact that the corporation is merely a façade for the operations of the dominant stockholder or stockholders.  Port Drivers Fed'n 18, 757 F. Supp. 2d at 456-57 (citing Verni, 903 A.2d at 498).  "In the summary judgment context, the alter ego doctrine . . . will be applied only where the plaintiff alleges and proffers genuine and material facts from which a reasonable jury could find . . . that the defendant abused its corporate structure for fraudulent, unjust or inequitable purposes."  Portfolio Fin. Serv., 334 F. Supp. 2d at 627.

Indagro claims this Court should pierce the corporate veil based on the following: (1) Nilva operates Viva out of his residence, see de Klerk Decl, Ex. 16 at 14-15, 49-50, Dkt. No. 140-1; (2) Nilva's discrepancy about the number of Viva's employees, compare de Klerk Decl. Ex. 16 at 26-27 (eight or maybe ten employees) with Nilva Decl. at ¶ 4, Dkt. No. 133-1 (ten to fifteen employees); (3) the fact that Viva was grossly undercapitalized and that Nilva delayed putting Viva into bankruptcy because Viva had outstanding loans that Nilva personally guaranteed which would immediately be due in full, see de Klerk Decl. Ex. 15; (4) the lack of day-to-day involvement of the directors and officers and the failure to observe corporate formalities and keep corporate records, see de Klerk Decl. Ex. 16 at 17-18, 24; and (5) that Nilva

loaned money to Viva to pay expenses and legal fees, see id. at 19-21, 37-38; de Klerk Decl. Ex. 14 at 42-45.  This evidence is insufficient to justify piercing the corporate veil in this case.

The undisputed evidence here shows that Viva was formed and operated as a legitimate company and was not undercapitalized at its formation, during its operational existence, or at the time the parties entered into the JVA.  See Nilva Decl. Ex. A, Viva Chemical Corp. Cert. of Incorporation, Dkt. No. 133-2.  Viva was incorporated in New Jersey in 1995 and maintained a home office[12] in Fort Lee, New Jersey, and a satellite office in Moscow, Russia.[13]  See Def. Statement ¶¶ 1-2. For over eight years and prior to entering into the JVA with Indagro, Viva successfully conducted business with some of the largest chemical manufacturers and buyers in the world.  Def. Statement ¶¶ 5, 8; see also Nilva Decl. ¶¶ 5-6.  In addition, Viva was owned equally by Nilva and Lutsenko for a majority of its operational existence.  Def. Statement ¶¶ 3-4.

Indagro's argument regarding Viva's undercapitalization and insolvency is unpersuasive. The Third Circuit has explained that "[c]ompanies commonly become insolvent, then bankrupt; piercing the corporate veil is an exception reserved for extreme situations, rather than the rule. . . . Rather, the inquiry into corporate capitalization is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business."  Trs. Of the Nat'l

---

[12] Indagro has not pointed to, and the Court is not aware of, any case law suggesting that operating a corporation out of a home office is improper and sufficient to justify piercing the corporate veil.

[13] Indagro claims that Nilva's discrepancy about the number of Viva's employees, compare de Klerk Decl. Ex. 16 at 26-27 (eight or maybe ten employees) with Nilva Decl. at ¶ 4, Dkt. No. 133-1 (ten to fifteen employees) justifies piercing the veil.  First, Nilva's testimony that Viva had eight or ten employees in is Moscow office is not materially different from his declaration, wherein he recalled Viva maintained ten to fifteen employees.  Moreover, this dispute is immaterial and irrelevant to resolving this motion.  See Anderson, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

Elevators Indus. Pension, Health Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 197 (3d Cir. 2003); In re Paulsboro Derailment Cases, No. 13-784, 2015 WL 4914397, at *7 (D.N.J. Aug. 18, 2015); see also 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 41.33 (2002) (a "corporation that was adequately capitalized when formed, but which subsequently suffers financial reverses is not undercapitalized").  The fact that Viva may have been in financial trouble when the arbitration began, does not mean that Indagro can pierce the corporate veil to reach Nilva personally.  See Rowen Petroleum Props., LLC v. Hollywood Tanning Sys., Inc., 899 F. Supp. 2d 303, 309-10 (D.N.J. 2012); Lutyk, 332 F.3d at 197.  There is no evidence to suggest that Viva was undercapitalized at formation or during the years prior to the arbitration.[14]  And there is no evidence that Viva was formed for an improper purpose.

Indagro also points to Viva's delay in filing for bankruptcy and the alleged benefit that Nilva received as a result.  Indagro has not explained, and the Court is not aware, of any negative consequences to Viva from this delay that would indicate improper conduct and justify piercing the veil.  Indagro also claims that Nilva's loans to Viva to pay expenses and attorney's fees demonstrates improper conduct by Nilva.  The Court disagrees.  The Third Circuit has explained that "taking out a personal loan for the benefit of the corporation is the opposite of 'siphoning of funds of the corporation by the dominant stockholder,' which is the type of evidence typically used to justify disregarding the corporate form."  N. Am. Steel Connection, Inc. v. Watson Metal Prods. Corp., 515 F. App'x 176, 181 (3d Cir. 2013) (quoting Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145, 150 (3d Cir. 1988)).  There is no evidence that Nilva was siphoning funds from Viva.  Moreover, there is no evidence that Nilva was loaning money to a corporation and

---

[14] Nilva produced Viva's tax returns from 1998 through 2004, the year it entered into the JVA with Indagro, showing Viva's income, expenses, deductions, and other costs.  See Nilva Decl. Ex. B, Dkt. Nos. 134-1, 135-1, 136-1.

repaying himself with corporate funds while the corporation was failing.  See, e.g., United States v. Pisani, 646 F.2d 83, 88 (3d Cir. 1981 (affirming piercing of the corporate veil when the shareholder "repaid the [shareholder] loans to himself with corporate funds while the corporation was failing"); Crane v. Green & Freedman Baking Co., 134 F.3d 17, 23 (1st Cir. 1998).  Thus, there was nothing improper with Nilva's actions.

Indagro also argues that the lack of involvement of the officers and failure to observe corporate formalities and keep corporate records justifies piercing the veil.  Ordinarily, these factors would weigh in favor of piercing the corporate veil, but "such failures by a closely-held corporation such as [Viva] are not unusual, and not a strong factor in favor of piercing the corporate veil of such a company."  Lutyk, 332 F.3d at 196; see also 18 Am. Jur. 2d Corporations § 48 (2002) ("lack of formalities in a closely-held or family corporation does not often have as much consequence as where other kinds of corporations are involved").  Here, the missing formalities are not particularly compelling.  Nilva and Lutsenko, as the sole officers, may have failed to keep minutes and hold board meetings, but for a close corporation, this is unsurprising.

Indagro has failed to produce evidence that Viva was formed as a sham or that Nilva misused Viva to perpetrate some fraud or injustice or to otherwise evade the law to warrant piercing the corporate veil to hold Nilva personally liable for Viva's debt to Indagro.  Indagro's claim in Count Three fails as a matter of law.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is **GRANTED**.  This matter is therefore dismissed and the case is closed.  An appropriate order will follow.

**Date: June 30, 2016**                     _/s Madeline Cox Arleo_____
                                            **HON. MADELINE COX ARLEO**
                                            **UNITED STATES DISTRICT JUDGE**